Slip Op. 09-29

# UNITED STATES COURT OF INTERNATIONAL TRADE

|   |   |   |
|---|---|---|
| _____ | : |   |
| ALLOY PIPING PRODUCTS, INC., *et al.*, | : |   |
|   | : |   |
| Plaintiffs, | : |   |
|   | : |   |
| v. | : |   |
|   | : | **Before: Judith M. Barzilay, Judge** |
| UNITED STATES, | : | **Consol. Court No. 08-00027** |
|   | : |   |
| Defendant, | : |   |
|   | : |   |
| and | : |   |
|   | : |   |
| TA CHEN STAINLESS STEEL PIPE CO., LTD., | : |   |
|   | : |   |
| Defendant-Intervenor. | : |   |
| _____ | : |   |

## OPINION AND ORDER

[Plaintiffs' Motion for Judgment Upon the Agency Record is denied; Defendant-Intervenor's Motion for Judgment Upon the Agency Record is granted and the case is remanded to Commerce.]

Dated:  April 14, 2009

*Kelley Drye & Warren, LLP* (*Jeffrey S. Beckington*, *David A. Hartquist*) for Plaintiffs.

*Michael F. Hertz*, Acting Assistant Attorney General; *Jeanne E. Davidson*, Director, *Reginald T. Blades, Jr.*, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (*Stephen C. Tosini*); *Evangeline D. Keenan*, Attorney, Of Counsel, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, for Defendant.

*Miller & Chevalier Chartered* (*Peter J. Koenig*, *David T. Hardin, Jr.)* for Defendant-Intervenor.

**BARZILAY, JUDGE:**  The issues in this case concern the final results of the thirteenth administrative review of an antidumping duty order on stainless steel butt-weld pipe fittings from Taiwan during the period of review June 1, 2005 to May 31, 2006.[1]  *Notice of Final Results and Final Rescission in Part of Antidumping Duty Administrative Review: Certain Stainless Steel Butt-Weld Pipe Fittings From Taiwan*, 73 Fed. Reg. 1,202 (Dep't Commerce Jan. 7, 2008) ("*Final Results*"); *Issues and Decision Memorandum for the Administrative Review of Certain Stainless Steel Butt-Weld Pipe Fittings from Taiwan; Final Results of Antidumping Duty Administrative Review* (Dep't Commerce Dec. 27, 2007), Public Record Document ("P.R. Doc.") 97 ("*Issues and Decision Memorandum*").[2]  The underlying antidumping duty order, in place since 1993, has been the source of an abundance of litigation before the Court.[3]  *Amended Final Determination and Antidumping Duty Order: Certain Welded Stainless Steel Butt-Weld Pipe Fittings From Taiwan*, 58 Fed. Reg. 33,250 (Dep't Commerce June 16, 1993).  Here, the four Plaintiffs, Alloy Piping Products, Inc., Flowline Division of Markovitz Enterprises, Inc., Gerlin

---

[1] Once an antidumping order has been issued, it may be reviewed periodically.  *See* 19 U.S.C. § 1675 (2000) (governing the administrative review of determinations).  An "administrative review" occurs when an interested party requests that Commerce review the duty applied to the subject merchandise over a particular twelve month period.  19 U.S.C. § 1675(a)(1)(B) (2000).

[2] The *Issues and Decision Memorandum* is also available at http://ia.ita.doc.gov/frn/summary/taiwan/E7-25644-1.pdf.

[3] *See*, *e.g.*, *Alloy Piping Prods., Inc. v. United States*, Slip Op. 08-30, 2008 WL 743830 (Mar. 13, 2008) (not reported in F. Supp.) ("*Alloy Piping II*"); *Ta Chen Stainless Steel Pipe Co., Ltd. v. United States*, Slip Op. 07-87, 2007 WL 1573920 (May 30, 2007) (not reported in F. Supp.); *Ta Chen Stainless Steel Pipe, Ltd. v. United States*, 30 CIT 376, 427 F. Supp. 2d 1265 (2006) ("*Ta Chen II*"); *Alloy Piping Prods., Inc. v. United States*, 28 CIT 1805 (2004) (not reported in F. Supp.) ("*Alloy Piping I*"); *Ta Chen Stainless Steel Pipe, Ltd. v. United States*, 28 CIT 627, 342 F. Supp. 2d 1191 (2004) ("*Ta Chen I*").

Inc., and Taylor Forge Stainless, Inc. (collectively, the "Plaintiffs") and Defendant-Intervenor Ta

Chen Stainless Steel Pipe Co., Ltd. ("Ta Chen") challenge the final results of the thirteenth

administrative review pursuant to USCIT R. 56.2.[4]  The court must now decide whether the

dumping margin calculated by the Department of Commerce ("Commerce") is supported by

substantial evidence and in accordance with law.[5]  Specifically, Plaintiffs challenge Commerce's

(1) grant of a constructed export price ("CEP") offset adjustment to the Normal Value ("NV")

and (2) calculation of the profit adjustment to the CEP.[6]  The court affirms Commerce's

determination under (1), but finds that the agency did not provide a sufficient explanation that

demonstrates it acted with substantial evidence under (2).  Accordingly, the issue of the CEP

profit adjustment is remanded to Commerce for further proceedings.

_____

[4] Plaintiffs are domestic producers of the subject merchandise, and Ta Chen is a producer and exporter of the same goods from Taiwan.  Ta Chen sells some of the subject merchandise to its wholly-owned U.S. subsidiary, Ta Chen International ("TCI"), who in turn sells those goods to unaffiliated U.S. customers.  *See Issues and Decision Memorandum* at 1-2.

[5] The "dumping margin" refers to the amount by which the NV exceeds the export price ("EP") or CEP, expressed in an equation as DM = NV - (EP or CEP).  19 U.S.C. § 1677(35)(A).

[6] The NV is the market price of the subject merchandise in the home market, an appropriate third country market price, or the cost of production of the goods subject to statutorily permitted adjustments.  *See* 19 U.S.C. § 1677b(a)(1)(B)(i)-(ii), (a)(4).  The EP is the price at which the subject merchandise is sold from the producer or exporter to an unaffiliated purchaser in the U.S. or for exportation to the U.S.  *See* 19 U.S.C. § 1677a(a).  However, when the foreign producer or exporter is affiliated with the importer of the subject merchandise, a CEP usually is or may be used, which "refers to the price, as adjusted pursuant to section 1677a, at which the subject merchandise is sold in the [U.S.] to a buyer unaffiliated with the producer or exporter."  *SNR Roulements v. United States*, 402 F.3d 1358, 1359 (Fed. Cir. 2005).  Here, Commerce calculated the price of Ta Chen's sales in the U.S. based on a CEP rather than an EP because "the sale to the first unaffiliated U.S. customer was made by . . . TCI."  *Certain Stainless Steel Butt-Weld Pipe Fittings From Taiwan: Preliminary Results of Antidumping Duty Administrative Review and Notice of Intent to Rescind in Part*, 72 Fed. Reg. 35,970, 35,972 (Dep't Commerce Jul. 2, 2007) ("*Preliminary Results*").

## I. Background

On July 27, 2006, after receiving petitions from Plaintiffs and from Ta Chen, Commerce announced that it would initiate the thirteenth administrative review of the subject merchandise to update the applicable antidumping duty order. *Initiation of Antidumping and Countervailing Duty Administrative Reviews and Request for Revocation in Part*, 70 Fed. Reg. 42,028, 42,028 (Dep't Commerce July 21, 2005). To ensure that it would accurately determine the NV and CEP when calculating the dumping margin, Commerce requested that Ta Chen provide information regarding its channels of distribution, as well as the selling activities it performed and services it rendered in both its home and U.S. markets.[7] *See Preliminary Results*, 72 Fed. Reg. at 35,973. Ta Chen responded to these questions from Commerce in its Section A response, and noted that the "Sections B and C Questionnaire Responses [would] provide the data necessary to *calculate*

---

[7] *See* Ta Chen Section A Resp. (Sept. 11, 2006), P.R. Doc. 16. Ta Chen reported that the relevant selling activities in the home market during the period of review include maintaining inventory in Taiwan to provide just-in-time or immediate shipments to customers; incurring seller's risk of non-payment by customers; addressing customer complaints as to quality, delivery, or specification; handling freight and delivery arrangements; traveling to and entertaining customers; projecting market needs and conducting new customer research; providing customers with technical assistance; providing packing services; and providing after-sale services, including additional or supplemental documents sought by customers. *See* P.R. Doc. 16 at 12; *Issues and Decision Memorandum* at 38. For sales made to its U.S. affiliate, TCI, Ta Chen reported its selling activities as consisting of "accepting orders, scheduling production, and making arrangements for inland freight to the port, brokerage, containerization and Taiwan customs clearance, including payment of harbor tax." *Id.* Additionally, Ta Chen noted that TCI is a "master distributor" that engages in the following selling activities to the first unaffiliated customers in the United States: "all communications with customers, U.S. customs duties, U.S. brokerage, U.S. inland freight, U.S. warehousing, inventory maintenance and assumption of risk of nonpayment." *Id.*

the CEP offset" necessary to reflect different levels of trade ("LOT").[8]  P.R. Doc. 16 at 14

(emphasis added).  Before Commerce issued the *Preliminary Results*, Ta Chen twice provided

additional information on selling activities performed in Taiwan and on its claim for a CEP offset

on February 15 and April 6, 2007, respectively.  *See* Ta Chen's Response to Commerce's First

Supplemental Questionnaire (Feb. 15, 2007), P.R. Doc. 38; Ta Chen's Response to Commerce's

Second Supplemental Questionnaire (Apr. 6, 2007), P.R. Doc. 45.

In the *Preliminary Results*, Commerce examined the selling activities that Ta Chen

reported for each channel of distribution and organized the home market reported activities into

the following four categories: (1) sales process and marketing support; (2) freight and delivery;

(3) inventory maintenance and warehousing; and (4) warranty and technical services.

*Preliminary Results*, 72 Fed. Reg. at 35,973.  Using these four defined selling activities as the

framework for its analysis, Commerce found that there were different LOTs in Ta Chen's home

and U.S. markets, and that sales were made by Ta Chen in Taiwan at a more advanced LOT than

in the U.S. market.  *Id*.  Specifically, Commerce noted that in the home market "Ta Chen

provides significant selling [activities] . . . which it does not for the U.S."  *Id*.  Because

Commerce was unable to quantify a LOT adjustment, it adjusted the NV with a CEP offset.  *Id*.

Commerce also made an adjustment to the CEP to account for the profit from selling expenses

incurred in the U.S. by TCI, stating that "in accordance with [§§ 1677a(d)(3) and 1677a(f)], we

deducted [the] CEP profit."  *Id*. at 35,972.  Ultimately, Commerce determined that the weighted-

_____

[8] The Section B Questionnaire contained information on Ta Chen's home market sales, whereas the Section C Questionnaire explained its U.S. sales.  *See* Ta Chen's Section B and C Resps. (Sept. 26, 2006), P.R. Doc. 18.

average dumping margin for the subject merchandise during the period of review was 0.52%. *Id.* at 35,973.

In the *Final Results* and the accompanying *Issues and Decision Memorandum,* Commerce reaffirmed its earlier findings on the adjustments to the NV and CEP. *Final Results*, 73 Fed. Reg. at 1,202; *Issues and Decision Memorandum* at 35-41. Specifically, with thorough explanation and detailed justification, Commerce found that "the LOT is more advanced in the home market than in the United States" and that it would apply a CEP offset to the NV because it was unable to quantify a LOT adjustment. *Issues and Decision Memorandum* at 38-39. On the issue of the profit adjustment to the CEP, Commerce affirmed the calculation in the *Preliminary Results* (which excluded Ta Chen's inventory carrying and credit costs from the "total expenses" and "total actual profit" components of the CEP profit calculation) and relied on the Court's decisions in cases that concerned the sixth and seventh administrative reviews of the underlying antidumping duty order. *Issues and Decision Memorandum* at 41 (citing *Ta Chen II*, 30 CIT at 389-90, 427 F. Supp. 2d at 1277; *Alloy Piping I*, 28 CIT at 1811). Accordingly, Commerce instructed U.S. Customs and Border Protection ("Customs") to assess antidumping duties on the subject merchandise that entered the U.S. during the period of review at a rate of 0.52%. *Final Results*, 73 Fed. Reg. at 1,203-04.

## II.  Subject Matter Jurisdiction & Standard of Review

In an action properly before the Court under 28 U.S.C. § 1581(c),[9] as is the case here, we must "hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ."[10] § 1516a(b)(1)(B)(i).  When reviewing an agency determination, the Court must therefore determine whether "the administrative record contain[s] substantial evidence to support it and [whether it is] a rational decision."  *Matsushita Elec. Indus. Co., Ltd. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984) ("*Matsushita*").  Accordingly, for an administrative agency to support its factual findings with substantial evidence, a determination must necessarily include an explanation of the standards applied and the analysis leading to its conclusion, thereby demonstrating a rational connection between the facts on the record and the conclusions drawn.  *See id*.  Finally, an agency's action is in accordance with law when that decision is "constitutional, and not contrary to statute, regulation, precedent, or procedures."  *Huvis Corp. v. United States*, 31 CIT ___, 525 F. Supp. 2d 1370, 1374 (2007).

---

[9] Pursuant to § 1581(c), this Court has exclusive jurisdiction over any civil action commenced under section 516A of the Tariff Act of 1930, codified as amended at 19 U.S.C. § 1516a, which provides for judicial review of a final determination in an administrative review of an antidumping order.  *See* § 1516a(a)(2)(B)(iii).

[10] Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support the conclusion," and that there may be two inconsistent conclusions drawn from the evidence "does not prevent an administrative agency's finding from being supported by substantial evidence."  *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 619-20 (1966) (quotations & citations omitted).

### III.  Discussion

"Dumping" is an unfair trade practice whereby goods are sold or will likely be sold at less than fair value.  § 1677(34).  Commerce, the administrative agency responsible for addressing the issue of dumping, must calculate the dumping margin to assess whether the subject merchandise was, or is likely to be, dumped in the U.S.  § 1675(a).  The first step for Commerce is to ascertain the value of two elements in the dumping margin equation: (1) the NV and (2) the EP or CEP.  § 1675(a)(2)(A).  Commerce compares the two values and, if the NV exceeds the EP or CEP, it then instructs Customs to levy antidumping duties on the subject merchandise in the amount of the difference between the two elements.[11]  §§ 1675(a)(1), 1677(35)(A)-(B).

When Commerce calculates the dumping margin, certain adjustments may be made to the NV or CEP to ensure an "apples-to-apples" price comparison since the prices used to determine those values occur at different points in the stream of commerce and under different circumstances.  *See Ta Chen II*, 30 CIT at 379, 427 F. Supp. 2d at 1268.  At issue before the court is the calculation of, and adjustments to, the prices that comprise the NV and CEP in this, the thirteenth administrative review of the antidumping order on the subject merchandise.

### A.  Constructed Export Price Offset

#### 1.  Legal Framework

The NV refers to the price of the subject merchandise in the home market, an appropriate third country market price, or the cost of production of the subject goods.  § 1677b(a)(1)(B)(i)-

---

[11] A finding by the International Trade Commission ("ITC") that the subject merchandise materially injured or threatens material injury to the domestic industry is a condition precedent to Commerce instructing Customs to apply antidumping duties on the subject merchandise. § 1673d(b)(1).

(ii), (a)(4).  Commerce may make certain adjustments to the NV to ensure that the NV is

established, "to the extent practicable, at the same [LOT] as the [EP] or [CEP] . . . ."

§ 1677b(a)(1)(B)(i); *see* 1677b(a)(6)-(8).  A CEP offset, which is a downward adjustment to the

NV, is one of the permitted adjustments that may be made to the NV.  § 1677b(a)(7)(B).  Three

conditions must be satisfied before Commerce may apply a CEP offset to the NV: (1) there must

be a difference between the LOT of the home and U.S. markets – *i.e.*, between the NV and the

CEP; (2) the NV must be at a more advanced LOT than the CEP; and (3) a LOT adjustment to

the NV is not appropriate since the available data does not permit a determination on whether the

difference between the home and U.S. markets affects price comparability.  *See* 19 C.F.R.

§ 351.412(f).

      LOTs are defined as marketing stages (or their equivalent).  *See Alloy Piping II*, 2008

WL 743830, at *8 (citing 19 C.F.R. § 351.412(c)(2)).  "Where Commerce calculates [the] NV at

a different LOT from the LOT of [the] EP or the CEP (whichever applies), it may adjust [the]

NV to compensate for the difference."  *Id*. (citing § 351.412(b); *see Mittal Steel USA, Inc. v.

United States*, Slip Op. 07-117, 2007 WL 2701369, at *7 n.12 (Aug. 1, 2007) (not reported in F.

Supp.).  Specifically, "Commerce may make a LOT adjustment if it determines that sales in the

two markets were not made at the same LOT, and that the difference has an effect on the

comparability of prices."  *Alloy Piping II*, 2008 WL 743830, at *8 (citing § 351.412(a);

§ 1677b(a)(7)(A)) (quotations & brackets omitted).  The focal point of Commerce's  LOT

adjustment analysis is on the *selling activities* performed in each market.  § 1677b(a)(7)(A)(i)-

(ii); § 351.412(c)(2).  In other words, a LOT adjustment to the NV is proper only where (1) there

exists a difference between the LOT in the home and U.S. markets as a result of different selling

activities being performed in each market, and (2) such difference "affect[s] price comparability,

based on a pattern of consistent price differences between sales at different [LOTs] in the country

in which [the NV] is determined." § 1677b(a)(7)(A); *see Uruguay Round Agreements Act,*

*Statement of Administrative Action*, H.R. Rep. No. 103-316, at 829 (1994), *reprinted in* 1994

U.S.C.C.A.N. 4040, 4167-68 ("*SAA*"); *Mittal Steel USA, Inc.*, 2007 WL 2701369, at *8.

However, in cases where a LOT adjustment is unavailable, a CEP offset to the NV may

be proper.  In particular, when (1) "the NV is at a more advanced LOT than the CEP, and [(2)]

the available data do[es] not permit a determination on whether the difference affects price

comparability," Commerce may make a CEP offset to the NV in the amount of the indirect

selling expenses incurred by the foreign producer or exporter in the home market.  *Alloy Piping*

*II*, 2008 WL 743830, at *8 (citing § 351.412(f)).  In those situations,

> normal value shall be reduced by the amount of indirect selling expenses incurred in
> the country in which normal value is determined on sales of the foreign like product
> but not more than the amount of such expenses for which a deduction is made under
> section 1677a(d)(1)(D) of this title.

§ 1677b(a)(7)(B).  When a foreign producer or exporter seeks a downward adjustment to the NV

in the form of a CEP offset, it "must demonstrate the appropriateness of such adjustment."[12]

*SAA*, H.R. Rep. No. 103-316, at 829, 1994 U.S.C.C.A.N. at 4168.

---

[12] "Commerce will require evidence from the foreign producers that the functions
performed by the sellers at the same [LOT] in the U.S. and foreign markets are similar, and that
different selling activities are *actually performed* at the allegedly different levels of trade."  *SAA*,
H.R. Rep. No. 103-316, at 829, 1994 U.S.C.C.A.N. at 4168 (emphasis added).

## 2. Ta Chen's Selling Activities

The core of Plaintiffs' first challenge argues that Ta Chen's Sections A, B and C

Responses to Commerce's questionnaires – and specifically its description of its selling activities

in the home and U.S. markets – are so "variously and internally inconsistent" that Ta Chen did

not clearly demonstrate it was entitled to a CEP offset adjustment to the NV.  Plaintiffs' Brief in

Support of its Rule 56.2 Mot. ("Pl. Br.") 11-15.  In home market sales, Plaintiffs claim that

Commerce incorrectly found that inland freight services are one of Ta Chen's selling activities in

the home market, even though customers pick up orders from Ta Chen's facility in Taiwan and

no expenses were incurred.  Pl. Br. 11-12.  Another alleged error cited by Plaintiffs is

Commerce's determination that packing expenses and just-in-time inventory expenses are selling

activities in the home market, even though there was little evidence to support such a finding.  Pl.

Br. 12.  Plaintiffs also argue that Commerce incorrectly considered credit risk and technical

services to be selling activities since no interest revenue or travel expenses were incurred during

the period of review.  Pl. Br. 12-13.  In its U.S. sales to TCI, Plaintiffs allege that Ta Chen

grossly understated its U.S. selling expenses, and excluded other costs incurred for the subject

merchandise to enter the U.S.  Pl. Br. 15.

Further, according to Plaintiffs, a quantitative analysis of Ta Chen's selling *expenses*

shows that Ta Chen's home market selling functions were less than those provided in sales to

TCI in the U.S. market.  Pl. Br. 8.  Plaintiffs also claim that Commerce's grant of a CEP offset to

the NV is not supported by substantial evidence because the U.S. LOT is more advanced than the

home market LOT since a greater number of expense fields and amounts correspond to the CEP

sales.  Pl. Br. 11, 15-31.

The court finds that the record is neither ambiguous nor unclear, and that Plaintiffs' LOT

adjustment analysis is legally inaccurate.  To be sure, the court commends Plaintiffs' diligent

quantitative analysis and recognizes that Commerce should address this kind of detailed

information, in the first instance, when determining whether an adjustment to the NV is proper.[13]

However, the focus of the LOT adjustment analysis, which may ultimately lead to a CEP offset,

is on *selling activities* and not on expenses as the Plaintiffs suggest.[14]  § 1677b(a)(7)(A)(i)

(stating that a difference in LOTs is based on the "performance of different *selling activities*"

(emphasis added)); § 351.412(c)(2) (noting that "[s]ubstantial differences in *selling activities* are

a necessary, but not sufficient, condition for determining that there is a difference in the stage of

marketing." (emphasis added)); *SAA*, H.R. Rep. No. 103-316, at 829, 1994 U.S.C.C.A.N. at 4168

(emphasizing that a difference in the LOT means that there "is a difference between the *actual*

---

[13] Defendant avers that because they did not first present this kind of quantitative analysis to Commerce, Plaintiffs have not exhausted their administrative remedies. Def. Br. 11. Because the court addresses and decides in favor of the Defendant considering and rejecting the substance of Plaintiffs' argument, it need not address the exhaustion issue here. However, the parties should know that these sorts of factually intensive, record-based arguments are best decided, and indeed are normally required to be first presented, in the administrative arena.

[14] The term "activities" is the plural form of the word "activity," which refers to "a specified pursuit or action." AMERICAN HERITAGE COLLEGE DICTIONARY 14 (4th ed. 2007). Similarly, a "function" is "the action for which a . . . thing is particularly fitted or employed." *Id*. at 561. In contrast, an "expense" is "[s]omething *spent* to attain a goal or accomplish a purpose." *Id*. at 491 (emphasis added). Accordingly, an expense is something incurred in, and is not itself, an activity or function. *See id*. at 14, 491.

*functions* performed by the sellers at the different [LOTs] in the two markets" (emphasis added));

*Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,371 (Dep't Commerce May

19, 1997) (explaining that § 1677b(a)(7)(A)(i) provides for LOT adjustments where there is a

difference in the LOTs and "the difference involves the performance of different *selling*

*activities*. . . . The [SAA] reinforces this point by explaining that [Commerce] must analyze the

*functions* performed by the sellers . . . ." (emphasis added) (quotations omitted)).

　　　If Commerce, or this Court, in reviewing an administrative determination, were to narrow

the focus of its LOT analysis to selling expenses, it could act contrary to law and cause

misleading results. Expenses do not necessarily translate directly into activities, nor do they

capture the intensity of the activities. Moreover, expenses related to several selling activities

may fall under a single expense field. Though expenses alone may not accurately represent the

number of selling activities associated with each LOT, Commerce may certainly analyze

expenses to measure the frequency of various selling activities, and consider this frequency with

other information in assigning the level of intensity to the activity. *See*, *e.g.*, *Slater Steels Corp.*

*v. United States*, 27 CIT 1775, 1780-81, 297 F. Supp. 2d 1351, 1357-58 (2003). In other words,

the weighing of both the narrative descriptions of the foreign producer or exporter's sales

processes with certain quantifiable information on the reported selling activities in each market is

precisely the kind of thorough and diligent analysis that would benefit Commerce, the interested

parties and, if need be, this Court.

　　　The record here supports Commerce's determination that a CEP offset to the NV is

proper. In the *Issues and Decision Memorandum*, after it established the selling activities in each

market,[15] Commerce determined that there is a difference in the LOT between home market and U.S. sales, and that "Ta Chen's home market sales are made at a more advanced LOT than its [CEP] sales to TCI . . . ." *Issues and Decision Memorandum* at 37-39.  Commerce specifically noted that while Ta Chen's activities related to freight and delivery arrangements are somewhat greater for sales to TCI than in its home market, "the record shows that Ta Chen engages in a *higher level of sales effort* for home market sales than for U.S. sales." *Id*. at 38 (emphasis added).  Commerce stated that Ta Chen likely exerted more of an intense effort in home market sales because it "has more home market customers who purchase in smaller volumes than TCI and require more individual contact." *Id*.  That Ta Chen assumed credit risk and provided technical services, in addition to offering just-in-time delivery only in the home market, also convinced Commerce that the selling activities were different and at a more advanced level in the home market than in the United States. *See id*. at 38-39.  Because Commerce was also unable to quantify the effect of the difference in LOT on prices, it ultimately decided to continue to grant Ta Chen a CEP offset to the NV.  *Id*.  Thus, Commerce's analysis includes an explanation of the standards it applied, and the analysis that led to its conclusion, demonstrating a rational connection between the facts on the record and the conclusions drawn.

Finally, Plaintiffs argue that the facts in this administrative review are nearly identical to those in the seventh administrative review of the subject merchandise, such that Commerce incorrectly granted Ta Chen the CEP offset to the NV.  Pl. Br. 34-37 (discussing generally *Certain Stainless Steel Butt-Weld Pipe Fittings From Taiwan: Final Results of Antidumping*

---

[15] *See supra* note 7.

*Duty Administrative Review*, 66 Fed. Reg. 65,899 (Dep't Commerce Dec. 21, 2001)) ("*Seventh*

*Administrative Review*").  Plaintiffs' reliance on the *Seventh Administrative Review*, however, is

misplaced.  Even assuming Commerce's determinations at issue are factually identical, as a

matter of law a prior administrative determination is not legally binding on other reviews before

this court.  *See, e.g.*, *Timken U.S. Corp. v. United States*, 434 F.3d 1345, 1352 (Fed. Cir. 2006).

Thus, the court is not persuaded by Plaintiffs' suggestion to follow the analysis in the *Seventh*

*Administrative Review* given that Commerce has demonstrated with substantial evidence, and in

accordance with law, that a CEP offset is proper under the facts of the present case.

**B.  Constructed Export Price Profit**

**1.  Legal Framework**

The other component of the dumping margin calculation, the CEP, is the price at which

the subject merchandise is first sold in the U.S. to a purchaser independent from the foreign

producer or exporter.  § 1677a(b).  To ensure an "apples-to-apples" comparison between home

market and U.S. sales, section 1677a authorizes Commerce to make adjustments to the price used

to establish the CEP, one of which reduces that value to account for the portion of profit

attributable to certain U.S. selling activities.  § 1677a(d)(3).  The deduction of the profit amount,

called the CEP profit, is intended to bring the CEP "as closely as possible [to] a price

corresponding to an export price between non-affiliated exporters and importers."  *See SAA*, H.R.

Rep. No. 103-316, at 823, 1994 U.S.C.C.A.N. at 4163.

The CEP profit is derived by multiplying the total actual profit for all production and

selling activities of the subject merchandise by the applicable percentage, with the applicable

percentage determined by dividing the total U.S. expenses by the total expenses, *i.e.*, CEP profit

= Total Actual Profit x (Total U.S. Expenses / Total Expenses).  §§ 1677a(d)(3), (f).  The "total

actual profit" multiplier is calculated by "(1) adding the revenue attributable to sales of subject

(or like) merchandise in both the U.S. and the home market; (2) deducting from that sum the cost

of the merchandise for both markets; and (3) deducting the selling, packing, and distribution

expenses for both markets."  *Ta Chen II*, 30 CIT at 380, 427 F. Supp. 2d at 1269 (citing

§ 1677a(f)(2)(D)).  The "total expenses" denominator is the sum of "(1) the cost of merchandise

for both markets and (2) the selling, packing, and distribution expenses for both markets."  *Id*.

(citing § 1677a(f)(2)(C)).  In both of these components, "*recognized financial expenses* are

included in the cost of both the U.S. and the home market merchandise."  *Id*. (citing U.S.

Department of Commerce Policy Bulletin 97/1, Calculation of Profit for Constructed Export

Price Transactions (Sept. 4, 1997); *SAA*, H.R. Rep. No. 103-316, at 825, 1994 U.S.C.C.A.N. at

4164).[16]  Historically, Commerce has read "the statute to require that those two numbers be

actual (*i.e., recognized*) amounts," and that they do "not include *imputed* financial expenses

. . . ," which are themselves an estimate of actual expenses.  *Ta Chen II*, 30 CIT at 381, 427 F.

Supp. 2d at 1269.  Therefore, to avoid double-counting, Commerce has reasoned that it is proper

to exclude imputed costs from the "total actual profit" multiplier and "total expenses"

---

[16] "[W]hen calculating both the Total Actual Profit multiplier and the Total Expenses denominator, net financial expenses are calculated from the foreign producer [or] exporter's constructed value ('CV') database in determining the cost of U.S. merchandise, and from the foreign producer [or] exporter's cost of production ('COP') database in determining the cost of home market merchandise."  *Ta Chen II*, 30 CIT at 380-81, 427 F. Supp. 2d at 1269 (citing §§ 1677b(e), 1677b(b)(3)) (quotations & brackets omitted).

denominator since total actual financial expenses reflect the costs of carrying merchandise in inventory and extending credit. *See Ta Chen II*, 30 CIT at 381, 427 F. Supp. 2d at 1270.

However, in contrast to the two above, the calculation of the last component of the CEP profit equation – "total U.S. expenses" – includes imputed credit and inventory carrying costs. Commerce has explained that "the imputed financial expenses related to selling activities[,] *i.e.*, imputed credit and inventory carrying costs[,] simply represent the opportunity cost of having . . . merchandise sit in inventory prior to sale, and of extending credit after the sale." *Ta Chen II*, 30 CIT at 381, 427 F. Supp. 2d at 1269-70 (quotations & brackets omitted). Moreover, Commerce has noted that its practice is to use imputed expenses in the "total U.S. expenses" numerator because, "as a practical matter, appropriate [actual] figures do not exist." *Id*., 30 CIT at 381, 427 F. Supp. 2d at 1270.

This Court and the Federal Circuit have repeatedly upheld this kind of method for calculating CEP profit in the absence of certain conditions. *See Ta Chen II*, 30 CIT at 383, 427 F. Supp. 2d at 1271 (citing *SNR Roulements*, 402 F.3d at 1361; *SNR Rouelements v. United States*, 28 CIT 1284, 1287-88, 341 F. Supp. 2d 1334, 1340 (2004); *Thai Pineapple Canning Indus. Corp., Ltd. v. United States*, 24 CIT 107, 114-15 (2000) (not reported in F. Supp.) ("*Thai Pineapple*")). For instance, in *Thai Pineapple*, the court examined Commerce's remand determination and sustained the CEP profit calculation, as it found that plaintiffs could not point to any great distortion or discrepancy in the methodology used. 24 CIT at 115.

## 2.  Commerce's CEP Profit Calculation

Here, Ta Chen lodges a complaint against Commerce that is eerily familiar to one that it

alleged in at least two prior proceedings before the Court – namely, that the agency erred when it

excluded imputed inventory carrying and credit costs from the "total actual profit" multiplier and

"total expenses" denominator.[17]  *Issues and Decision Memorandum* at 40-41.  Commerce refused

to do so, however, on the basis that (1) Ta Chen's argument had been rejected before and (2) this

Court has allegedly found that "imputed expenses [do not] represent some real, previously

unaccounted for, expense[]."  *Id*. at 41 (quotations & citations omitted).  Ta Chen argues that this

reasoning is insufficient to uphold Commerce's determination since "Commerce failed to explain

why the use of only purported actual costs was sufficient based on the record evidence of this

particular case . . . ."  Defendant-Intervenor's Brief in Support of its Rule 56.2 Mot. ("Def.-

Intervenor Br.") 8.  Expanding on its contention at the administrative stage, Ta Chen argues that

controlling law unequivocally requires that the actual costs used in the "total actual profit"

multiplier  and "total expenses" denominator must adequately reflect imputed costs.[18]  Def.-

Intervenor Br. 9-14.

In contrast, Plaintiffs aver that Ta Chen did not exhaust its administrative remedies on the

issue of CEP profit and, therefore, the court may not hear this claim.  Plaintiffs' Resp. to Def.-

---

[17] *Ta Chen II*, 30 CIT at 382, 427 F. Supp. 2d at 1270; *Alloy Piping I*, 28 CIT at 1808-12.

[18] Relatedly, as a result of the alleged controlling law, Ta Chen further claims that
(1) Commerce's failure to include imputed costs in this administrative review is unsupported by
substantial evidence and contrary to law, (2) Commerce's failure to include imputed costs yields
a distorted result, and (3) Commerce's CEP profit calculation is unreasonable since a more
accurate methodology exists.  Def.-Intervenor Br. 9, 14-27.

Intervenor's 56.2 Mot. ("Pl. Resp. Br.") 1-7.  Both Defendant and Plaintiffs contend that,

irrespective of whether Ta Chen exhausted its administrative remedies, Commerce's CEP profit

determination is supported by substantial evidence and in accordance with law since the CEP

profit methodology employed by Commerce has repeatedly been approved by the Federal Circuit.

Pl. Resp. Br. 7-14; Def. Br. 16-25.

Generally, no party is entitled to judicial relief for an alleged injury "until the prescribed

administrative remedy has been exhausted."  *Agro Dutch Indus., Ltd. v. United States*, 30 CIT

320, 330 (2006) (not reported in F. Supp.) (quoting *McKart v. United States*, 395 U.S. 185, 193

(1969)).  "The exhaustion doctrine requires a party to present its claims to the relevant

administrative agency for the agency's consideration before raising these claims to the Court."

*Luoyang Bearing Corp. v. United States*, 28 CIT 733, 760, 347 F. Supp. 2d 1326, 1351 (2004)

(citing *Unemployment Comp. Comm'n of Alaska v. Aragon*, 329 U.S. 143, 155 (1946) ("A

reviewing court usurps the agency's function when it sets aside the administrative determination

upon a ground not theretofore presented and deprives the [agency] of an opportunity to consider

the matter, make its ruling, and state the reasons for its action.")) ("*Luoyang*").[19]  "While a

---

[19] The court in *Louyang* went on to note that there is "no absolute requirement of exhaustion in the Court of International Trade in non-classification cases," and that Congress vested the Court with the discretion to determine the circumstances under which it shall require the exhaustion of administrative remedies.  *Luoyang*, 28 CIT at 760 n.11, 347 F. Supp. 2d at 1352 n.11 (citation omitted).  The Court has recognized exceptions to the exhaustion doctrine in instances where: "(1) requiring it would be futile; (2) a subsequent court decision has interpreted existing law after the administrative determination at issue was published, and the new decision might have materially affected the agency's actions; (3) the question is one of law and does not require further factual development and, therefore, the court does not invade the province of the agency by considering the question; and (4) plaintiffs had no reason to suspect that the agency would refuse to adhere to clearly applicable precedent."  *Luoyang*, 28 CIT at 760-61 n.11, 347 F. Supp. 2d at 1352 n.11 (citations omitted).

plaintiff cannot circumvent the requirements of the doctrine of exhaustion by merely mentioning a broad issue without raising a particular argument, [a] plaintiff's brief statement of the argument is sufficient if [(1)] it alerts the agency to the argument with reasonable clarity and [(2)] avails the agency with an opportunity to address it." *Id.*, 28 CIT at 761, 347 F. Supp. 2d at 1352 (citations omitted).

Here, Ta Chen challenged the issue of the CEP profit in the underlying administrative review with sufficient specificity so as to provide Commerce with an opportunity to address the claim. In its original brief challenging Commerce's CEP profit methodology, Ta Chen argued:

> Ta Chen's U.S. subsidiary [TCI] incurs enormous inventory carry[ing] and credit costs (from delay in customer payment) as to its U.S. sales    . . . . [Commerce] should adjust its calculation of Ta Chen's CEP Profit to include such costs. Doing so accurately reflects Ta Chen's true profit and costs.

Pl. Resp. Br. App. 1 at 2. That Ta Chen (1) cited specifically to its inventory carrying and credit costs and (2) asked Commerce to account for those costs shows that it alerted Commerce of its argument with reasonable clarity. Moreover, Commerce acknowledged the issue, first by summarizing Ta Chen's argument (and Plaintiffs' contentions) and subsequently rejecting it in the *Final Results* and accompanying memorandum. *Issues and Decision Memorandum* at 40-41. While Defendant's avoidance of this issue in its brief is telling, it is not dispositive. Def. Br. 16-25. Therefore, the court finds that Ta Chen properly exhausted its administrative remedies and may raise this issue.

Ta Chen, however, misreads what it alleges to be the controlling law on the calculation of the CEP profit. Specifically, Ta Chen mistakes *SNR Roulements* to stand for the proposition that the actual costs used in the "total actual profit" and "total expense" components of the CEP profit

equation *must* adequately reflect imputed costs.  Def-Intervenor Br. 9-14.  That case stands for no

such rule; rather, the Federal Circuit merely stated that Commerce must afford interested parties

"*an opportunity* to make a showing that their dumping margins were wrongly determined

because Commerce's use of actual expenses did not account for U.S. credit and inventory

carrying costs in the calculation of total expenses."  *SNR Roulements*, 402 F.3d at 1363

(emphasis added).  That is, "Commerce may account for credit and inventory carrying costs using

imputed expenses in one instance and using actual expenses in the other provided that Commerce

affords a respondent who so desires the opportunity to make a showing that the amount of

imputed expenses is not accurately reflected or embedded in its actual expenses."  *Id*. at 1361.

The Federal Circuit further noted that Commerce did not give the petitioner any opportunity to

argue that actual costs did not adequately reflect imputed costs.  *Id*. at 1363.  Because Ta Chen

was afforded such an opportunity in the thirteenth administrative review, the court finds *SNR*

*Roulements* inapplicable.

     If Commerce supports its determination with substantial evidence and it acts in

accordance with law, the Court will uphold the agency's finding.  *See* § 1516a(b)(1)(B)(i).  Here,

however, there is insubstantial evidence to support Commerce's determination that "an

adjustment to the [CEP profit] calculation is unwarranted."  *Issues and Decision Memorandum* at

41.  To justify the *Final Results*, Commerce cites to two instances where the Court has upheld

Commerce's CEP profit methodology in prior administrative reviews of the antidumping order

on the subject merchandise.  *Id*. (citing *Ta Chen II*, 30 CIT 376, 427 F. Supp. 2d 1265; *Alloy*

*Piping I*, 28 CIT 1805).  Commerce's justification misses the point.  The legal validity of this

kind of CEP profit methodology employed by the agency here is not at issue; rather, Commerce

fails to directly address Ta Chen's claim that, in the thirteenth administrative review, the

exclusion of imputed costs in the CEP profit calculation renders Ta Chen's actual costs

inaccurate.[20]   The cited cases do not stand for the proposition that Commerce's CEP profit

methodology is unquestionably in accordance with law, but rather state that in the particular

administrative reviews at issue – the sixth and seventh administrative reviews – Commerce

provided substantial evidence to support its finding that actual costs adequately reflect imputed

costs.  *See Ta Chen II*, 30 CIT 376, 382-83, 427 F. Supp. 2d at 1270-71; *Alloy Piping I*, 28 CIT at

1811-12.  That is, those cases concern different data compiled in different periods of review that

have no legal effect on the administrative review here.  Simply because the Court has rejected

identical claims by Ta Chen in other administrative reviews that involve different sets of data

does not suggest that Commerce need not address with rigor the particular claim at issue in the

thirteenth administrative review.

        The critical distinction between the record here and those of the two cases cited above is

that Commerce explained why actual costs adequately reflect imputed costs.  *See*, *e.g.*, *Ta Chen*

*II*, 30 CIT at 382-83, 427 F. Supp. 2d at 1270-71 (noting that the administrative determination

"explain[s] how the imputed financial expenses included in the 'Total U.S. Expenses' numerator

are a reasonable surrogate for the relevant recognized financial expenses included in both the

---

[20] Commerce also suggests that the Court found imputed costs, as a general rule, to be irrelevant in the CEP profit calculation since they do not "represent some real, previously unaccounted for, expense[] . . . ."  *Issues and Decision Memorandum* at 41 (citing *Alloy Piping I*, 28 CIT at 1811-12) (quotations omitted).  Commerce misreads the cited passage, which only found that Commerce adequately accounted for imputed costs in actual costs in the seventh administrative review.  *Alloy Piping I*, 28 CIT at 1811.

'Total Expenses' denominator and the 'Total Actual Profit' multiplier.").  In not one of those cases does Commerce, as here, adopt a conclusory statement to justify its finding.  Such a statement, without additional justification, hardly includes an explanation of the standards applied and of the analysis that led to Commerce's conclusion, nor does it demonstrate a rational connection between the facts on the record and the conclusions drawn.  *See Matsushita*, 750 F.2d at 933.

### IV.  Conclusion

For the foregoing reasons, the court holds that Commerce acted with substantial evidence and in accordance with law on the issue of the CEP offset to the NV.  The court finds that Commerce failed to provide substantial evidence for its findings regarding the CEP profit.  Accordingly, it is hereby

**ORDERED** that Plaintiffs' Motion for Judgment Upon the Agency Record is **DENIED**, that Defendant-Intervenor's Motion for Judgment Upon the Agency Record is **GRANTED** and that the case is **REMANDED** to Commerce for further proceedings not inconsistent with this opinion.  Specifically, it is

**ORDERED** that Commerce must provide a more rigorous analysis in its examination of whether imputed costs are adequately reflected in the total actual costs used in the "total actual profit" and "total expenses" components of the CEP profit methodology; it is further

**ORDERED** that Commerce's determination on the issue of the CEP offset is **SUSTAINED**; and it is further

     **ORDERED** that Commerce shall have until June 16, 2009, to file its remand results with

the Court.  Plaintiffs and Defendant-Intervenor shall file their responses with the Court no later

than July 17, 2009.


Dated:    <u>April 14, 2009</u>                  <u>/s/ Judith M. Barzilay</u>
           New York, New York                 Judith M. Barzilay, Judge

## NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.

Tina Potuto Kimble
Clerk of the Court

Date: _____     By: _____
                                                                    Deputy Clerk